Filed 8/28/14  In re Daniel O. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re DANIEL O. et al., Persons Coming Under the Juvenile Court Law. | B250996 (Los Angeles County Super. Ct. No. CK89029) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SILVIA O. et al.,<br><br>    Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, S. Patricia Spear, Judge.  (Retired judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant Silvia O.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant Frederick O.

John F. Krattli, County Counsel, and John C. Savittieri, Deputy County Counsel, for Plaintiff and Appellant.

_____

Silvia O. (mother) and Frederick O. (father) appeal the order of the dependency court asserting jurisdiction over their four minor children under Welfare and Institutions Code section 300,[1] subdivisions (b) and (j) based on father's drinking and physical abuse of mother and two of the children and mother's physical abuse of the children.  Mother and father contend insufficient evidence supports the jurisdictional findings because the behavior complained of was remote in time, the parents are currently separated and in the process of divorce, and the issues leading to the dependency can be addressed in the pending dissolution proceedings.  Father also challenges the dependency court's dispositional order, contending that he is already receiving alcohol abuse counseling and is no longer a regular drinker.  Department of Children and Family Services (DCFS) cross-appeals the dependency court's order dismissing those counts of the petition under section 300, subdivision (a) and one count under subdivision (j), contending that substantial evidence does not support the finding that the parents will no longer physically abuse the children.  We affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

*1.  The Petition*

On July 10, 2013, DCFS filed a petition under subdivisions (a), (b) and (j) of section 300 relating to minors Daniel (born 2001), Isaac (born 2002), Viviana (born 2004) and Genesis (born 2006).

DCFS alleged incidents of domestic violence between mother and father.  On July 4, 2012, father repeatedly struck mother's stomach in front of the children and broke down the bedroom door where mother and the children sought refuge.  On July 18, 2012, in front of the children, father struck mother's arms and body with his fists while holding

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

mother's arm behind her back and stomped on mother's feet (counts a-1, b-1). On prior occasions, DCFS alleged that father struck Isaac with a belt and on another occasion pushed the child (counts a-2, b-2, j-1). DCFS also alleged that on prior occasions mother slapped and pinched the children (counts a-3, b-3, j-2). In addition, DCFS alleged that father had a history of alcohol abuse and was a current abuser of alcohol, and had been on occasion under the influence while caring for the children; further, father had a conviction for driving under the influence of alcohol (DUI) (count b-4).

2.      *Detention and Placement with Mother*

DCFS's detention report disclosed a history of problems dating from Daniel's birth. Mother had been living in a domestic violence shelter since September 9, 2012. Mother and father were in the process of getting a divorce, and proceedings were pending in family court in San Bernardino County.

In February 2013, mother met with a social worker and told the social worker she and the children were living in a domestic violence shelter. The social worker met with mother and the children several days later, at which time mother told the social worker that she had been married to father for 12 years and they had the four children together. In all of the years they had been married, there had been domestic violence in the home. In 2005, mother left father due to his drinking and his absences from the home, and on another occasion mother left father for one year and lived in a domestic violence shelter. At this time, father bought a house and changed his ways and came to mother, knelt down with a flower in his hand, cried, and asked her forgiveness. Mother and father reconciled following this apology, but in 2011 mother noticed that father was drinking alcohol and "reverting to his old ways." Father was working in San Diego, and would leave home to go to work for days at a time. When father was at home, he was aggressive and violent toward mother "for any little thing" and would hit the children with a belt, leaving marks on them. Mother admitted slapping, pinching, and spanking the children "due to her situation with [father]" but asserted that she no longer slaps, pinches or spanks the children and had not done so for a long time. Mother observed

3

father viewing pornography on his computer and spoke to some friends of hers about getting documents that would not permit father to be alone with the children.

Mother reported that she had gone to couples therapy to save the marriage but that father never attended any of the sessions. In July 2011, father expelled her from the home. She obtained a restraining order and father was granted monitored visitation.[2] Mother told the social worker that she was not planning to reconcile with father and had come to terms with the fact father was not going to change. Mother wanted to remain in the domestic violence shelter and proceed with her divorce from father. Mother reported that a hearing was scheduled in the dissolution proceedings on April 22, 2013 to address custody of the children, and a mediation was scheduled for March 25, 2013.

The social worker privately interviewed Genesis, who told the social worker that she did not like visiting father because she was afraid of him, but denied that either parent had hit her. Genesis had seen father drunk and had seen him hit mother. One time she saw father kick mother in the face, and she had also seen him push mother on the floor to take the telephone away from mother. The social worker also privately interviewed Daniel, who reported that he liked the family's current location, where he felt safe. Daniel reported that when mother and father lived together, they fought a lot, and he saw father hit mother one time and another time he saw father hit and push mother. Nonetheless, Daniel reported that father "was not really mean" and would take them to the park and buy them chips. Daniel missed father and would like to return to live with father at their home, but without the fighting. Daniel reported that father did not hit him, but would yell at him. Daniel got along well with his siblings.

The social worker interviewed Isaac alone. Isaac also liked where the family was currently living. He reported that mother and father fought and thus they had to move out of the family home. Father, who was drinking at the time, hit mother in the arm and the police responded to the home, but father did not go to jail. Isaac was afraid of father

---

[2] Mother obtained the restraining order on July 27, 2012.

when he drank alcohol.  Isaac had last seen father on February 16, 2013, and during the visit they talked and watched a movie.  Father gave the children money during visits.  However, Isaac did not want to live with father.  One time father had hit him and on another occasion had pushed him because father wanted Isaac to water the grass.

The social worker also interviewed Viviana, who also reported she liked where the family was living, but missed the house where they used to live.  While they were living at the house, father drank alcohol in the garage.  Viviana was afraid of father, but had never seen him hit mother.  Father used to punish her for not watering the flowers by sending her to her room.

On April 2, 2013, the social worker spoke to the coordinator at the domestic violence shelter where the family lived.  Mother had moved to the shelter from another shelter about two weeks before.  The coordinator said there were safety concerns about father because Daniel had told him where he attended school, which was near the shelter.

On May 16, 2013, mother called and left a voicemail for the social worker stating that she had been having problems with Daniel, who was violent toward his siblings and mother did not know how to control him.

On June 14, 2013, the social worker met with the family for a compliance visit.  The social worker met with Daniel, who reported that he gets frustrated with Isaac and his sisters because they did not listen to him.  The social worker explained that mother was so overwhelmed by the children's fighting that she was crying, and that Daniel should respect his mother.  Daniel assented and said he would not fight anymore.  Genesis reported that she felt safe with mother, and that her brothers Daniel and Isaac had hit her and she was scared of them.  The social worker met with Isaac and Viviana at the same time.  Isaac did not want to talk to the social worker because he thought she was going to take him to foster care, but when the social worker explained she wanted to discuss the fighting and hitting, he promised to behave.  The children reported that mother did not hit them.

The social worker discussed the children's need for therapy with mother. The social worker explained to mother that Isaac was having the worst time of the children and a good mentor would help him. Mother responded that her church was helping her with a membership for the Boys and Girls Club. Mother requested DCFS intervention and services.

The social worker believed the family needed to continue participating in therapy to address the trauma of the long-term exposure to domestic violence, and that Daniel and Isaac would benefit from a mentor program as mother was overwhelmed with them.

On June 20, 2013, mother left the social worker a voicemail message stating that she continued to have problems with Daniel and Isaac and did not know what to do with them. Daniel was violent and mother had called the police the day before because Daniel threw a chair. Police told her they could not do anything because of Daniel's age. Mother tried to get the children involved in activities but they refused. Mother was also concerned about Viviana and Genesis witnessing the boys' behavior.

On June 28, 2013, the social worker met with the family for a compliance visit. Mother reported that in May 2013 the children had begun unmonitored visitation with father as a result of the modification to the restraining order. The court had determined because there had been no instances of domestic violence between mother and father, there was no further need for monitored visitation. Mother reported that the combination of the children no longer participating in therapy,[3] unmonitored visitation with father, and inappropriate conversations with the paternal relatives was having a negative impact on the children. Daniel and Isaac's aggression had escalated significantly, and they were constantly fighting with each other and hitting the two younger children. Daniel and Isaac had assaulted mother on occasion and had become very abusive toward her.

Mother reported that she had an upcoming court hearing on July 1, 2013, and was considering giving father custody of Daniel and Isaac. The social worker informed

---

[3] The record does not precisely disclose the nature and amount of therapy the children received, or the dates of such therapy.

mother that sending Daniel and Isaac to live with father would put them at risk of harm. Rather, the family needed services to address the detrimental impact from the domestic violence. Mother acknowledged that she had erred in repeatedly reconciling and remaining with father. Mother felt that although therapy had not worked for the family, she was open to DCFS's recommendations and support. Mother agreed to participate in family preservation services.

Mother discussed the history of her relationship with father with the social worker. Within a few months of meeting father, mother became pregnant with Daniel and moved in with father when she was seven months pregnant. Two months after Daniel's birth, father did not come home for three to four days. Father slept for several days, and two weeks later came home under the influence of alcohol. Father insisted on sexual relations with mother in spite of her recent delivery of Daniel, and forced himself on her. After that time, father developed a pattern of not returning from work from Wednesdays until Sunday mornings. When father returned on Sunday mornings, he was in a bad mood, demanding to be fed and verbally abusive. A month later, mother discovered she was pregnant with Isaac and believed she became pregnant as a result of father's rape of her. During mother's pregnancy with Isaac, father's abusive behavior increased and mother left him on various occasions to live with her sister. Father would arrive at mother's sister's house, apologize and convince her to return. During one of the reconciliations, she and father got married, and mother believed marriage would change father. However, when mother went into labor with Isaac, father was nowhere to be found, and did not reappear until two days after Isaac's birth.

After Isaac's birth, mother went to live at her sister's home with the children for three months, but she reconciled with father and went back to live with him. About a month after this reconciliation, mother was at a party at father's Aunt Eva's home, and mother went to the garage to look for father and found him with his brother-in-law. The two men exchanged a white envelope which mother believed contained illicit drugs. Mother confronted father and reported what she saw to Aunt Eva; an altercation ensued

7

and mother was expelled from the home. When they would not let her take the children, mother pushed father.

As she left Aunt Eva's, the neighbors observed mother walking, crying and visibly distraught so they called police. When police responded, mother reported what had occurred. After the officers spoke with father and father's relatives, they arrested mother for pushing father. As a result, mother pleaded guilty to disturbing the peace and after that experience, she was afraid to call the police.

About four to six months later, mother and father reconciled again. Father wrote her romantic notes, brought her flowers and promised not to drink anymore. Mother and Daniel and Isaac went to live with father. Father did not stop drinking but cut down on his drinking. Things were going well, so mother decided to have another child and became pregnant with Viviana. Several months into her pregnancy, father started staying out again and when he returned home, he would be drunk and engage in arguments. In spite of the problems, mother remained in the home until Viviana was about a year old. Father had come home drunk and angry one day and aggressively demanded food. Mother and the children were scared and locked themselves in the bedroom. Father knocked down the bedroom door with his fists in a fit of rage, pushed her on the bed and stated that he paid for the family's living expenses, and threatened her not to harass him "or else." Father left in his car, and mother could hear his tires screeching as he drove away.

Mother left with the children and sought refuge in a domestic violence shelter. Mother reported that her relations with her sister were strained due to mother's repeated reconciliations with father. Mother had a difficult pregnancy and delivered Genesis at six months. Father discovered mother had delivered Genesis through his medical insurance and came to the hospital. Father promised mother that he would change and that the family needed a fresh start. Father had bought a house for the family, and mother noticed a change in father. Father treated them well and took an interest in the children's activities and school.

Four months later, mother and father reconciled and mother moved with the children back in with him. Father did not drink for two to three years and the relationship went well. However, at the end of 2010, father reverted back to his old ways and in addition to abusing drugs and alcohol, father's attacks escalated and became more violent. Father repeatedly told mother that he would take the children from her and no court would grant her custody of the children because she had been "blacklisted." Mother was convinced that due to her criminal conviction,[4] she had no chance of gaining custody of the children.

Father developed a habit of viewing pornography all the time on his computer and cell phone. Mother feared that the children would see father masturbating while viewing pornography. However, mother did nothing because she did not think she could get custody of the children and felt they were better off in a stable home. Mother believed during this time, father was arrested for drunk driving, but could not be sure because father never shared any information with her.

On July 4, 2012, father became angry, physically assaulted mother and kicked her in the stomach twice. In spite of her fear of the police, mother called 911 but the police never responded. On July 18, 2012, father came home from court in a very bad mood and his anger escalated when he could not find his cell phone. Mother found the phone, but before she could hand it to him, father pushed her on the couch, grabbed her from behind, threw her on the floor, face down, with her hands behind her back, and pinned her down with his foot. Father hit her repeatedly with his closed fists. She was able to roll over and father pressed his foot on her chest while the children were watching. Daniel yelled, "dad!" and father released his foot. Father went into the bedroom and "proceeded to destroy everything in the bedroom." Mother and the children left the family home and sought refuge at a domestic violence shelter.

---

[4] Mother had a May 2003 conviction for disturbing the peace and received 24 months probation.

Mother no longer believed father's promises to change. Mother also realized the long-term exposure to domestic violence had a detrimental effect on her children. Daniel and Isaac had difficulty controlling their anger and were quick to use physical violence against mother and their sisters. Daniel and Isaac's violence has increased dramatically since they started unmonitored visitation with father in May 2013.

Daniel and Isaac were abusive to mother, and would yell at her when she told them she could not buy all the things they wanted. Daniel and Isaac complained about their modest living situation and the lack of air conditioning. On one occasion, when a curtain rod fell off the wall and Daniel responded by calling her stupid and kicking her several times. Daniel and Isaac told the social worker they did not like where they lived, and that they would like to have their own bedrooms, more furniture, air conditioning, nice things and other comforts. Daniel and Isaac felt safe with mother and felt she did a good job taking care of them. Daniel and Isaac got frustrated with mother because she did not listen to them, and admitted yelling at mother and hitting her.

When the social worker asked Daniel and Isaac why they believed it was acceptable to hit and kick mother, they stated that mother does not do what she is told. They acknowledged that mother was the adult in the home and they should listen to her. Daniel and Isaac also hit their sisters but admitted that father would hit them for doing so. They acknowledged that father became violent when angry. They were sad because they could not help mother when father hit her.

Viviana and Genesis liked living with mother and felt safe with her. They do not like to leave mother alone when they visit father's family because they feared something bad might happen to mother. Viviana and Genesis know they live in the shelter because of father's violence. When father put his foot on mother's chest, both girls were afraid that father was going to come after them too. Genesis stated she is afraid when father drinks beer, and she reported that father still drinks beer when they visit him. Father gets "excited and crazy" and gets violent and angry.

DCFS reported that in late June 2013, the family required emergency relocation because father learned where Daniel attended school. Mother reported that the children still visited with father every other weekend but slept on the living room floor. Daniel was still hitting her and the other children. When the social worker met with the children on July 5, 2013, Daniel admitted hitting mother and his sisters, but stated he had difficulty controlling his temper. Isaac stated that he wanted an Xbox and that he would continue hitting mother until he obtained one. Isaac stated he would stop hitting mother and the girls if mother would let him visit father whenever Isaac wanted to. Daniel and Isaac stated that they had seen father hit mother for as long as they could remember. The social worker observed that Isaac's eyes were twitching, and Daniel informed the social worker that they twitched when Isaac got nervous and this had been going on for about a year. In spite of Daniel and Isaac's behavior problems at home, they have been polite and cooperative with the social workers and have not had inappropriate displays of violence or anger at school or outside the home.

Isaac's former therapist reported that he had treated Isaac for eight weeks before the family's emergency relocation due to father discovering where the family was living. At that time, Daniel was the only child exhibiting violent behavior, although Isaac was having "a difficult time." The therapist reported that mother was cooperative and open to recommendations. When Isaac disclosed to the therapist that father had hit him with a belt five times, the therapist informed mother of his reporting mandate with regard to suspected child abuse. Mother became upset over the potential involvement of DCFS and felt betrayed by the therapist.

While at the shelter, in December 2012, the children participated in a domestic violence group. The group facilitated coping skills, education on the effects of alcohol abuse within the family system and the effect upon children. Mother had been proactive in seeking services for the children and compliant with treatment. She participated actively in her own domestic violence group.

11

Mother reported on July 5, 2013 that the family law court had not made any decisions regarding custody, and had not modified the current visitation schedule. Father had overnight visits every other weekend, although the children sleep on the living room floor.

Father had a DUI conviction with alcohol blood content of .08 percent or higher stemming from a March 9, 2012 incident. Police had responded to a domestic violence dispute between mother and father, and mother called 911 to report that father was intoxicated and playing loud music. When police arrived, father had just left, but police conducted an area check and discovered father driving without his taillights on. Father was stopped and found to be intoxicated. Father was granted 36 months probation, ordered to pay a fine of $1,827, and attend an alcohol program.

DCFS recommended that children be detained with mother, with mother to participate in counseling, attend parenting, anger management and domestic violence classes, and DCFS recommended that father participate in counseling, attend parenting, anger management and domestic violence classes for perpetrators, and participate in a substance abuse program with random drug testing.

On July 10, 2013, the court ordered the children released to mother pending the next hearing. On July 11, 2013, the court found father to be the presumed father of the children, and released the children to mother.

3.    *Jurisdiction and Disposition*

DCFS's jurisdictional report stated that the children were placed with mother. Viviana told the social worker that while the family was living with father, he touched her sexually several times. Mother was not aware of this. Isaac reported that while living at home with father, father had hit him with a belt on five different occasions.

Both mother and father had criminal histories. Mother had a conviction for disturbing the peace resulting from an October 31, 2002 incident.[5] Father had numerous

---

[5] The record is not entirely clear, but this appears to be based on the incident at father's Aunt Eva's home.

12

arrests for substance abuse, battery, being under the influence of drugs, DUI, and the March 2012 DUI conviction.

DCFS reported that father had not made himself available for an interview. Mother did not have any contact information, although father had been visiting the children. Daniel reported that father would hit him and Isaac with a belt, but the belt did not leave a bruise. Daniel stated that mother would be washing the dishes when father hit him and would tell father to stop, but father "would move her out of the way." Isaac stated the last time father hit him with a belt was the previous year, before they moved. Isaac stated that when father hit him with a belt, mother would say, "that's what you get." Viviana reported that father did not use the belt on the girls. The children further reported that mother would pinch them when they misbehaved.

The family law court had held a review hearing on July 1, 2013, and ordered the children to attend counseling, and father was admonished to return the children on time to mother.

At the August 12, 2013 jurisdiction and disposition hearing, father testified that he picked the children up every other weekend on a Friday at 9:00 p.m. and returned them Sunday at 7:00 p.m. This custody arrangement had been ordered in the family court proceedings, which were pending in San Bernardino. The visits were unmonitored. Father and mother had not lived together for about 15 months. The event leading to their separation was an argument over a cell phone bill. Father was sitting at the table paying bills, and discovered that mother's cell phone bill was $600. Father took mother's phone away, telling her that "you don't know how to use it." Mother became upset. Father has not been in contact with mother since she moved out. For his DUI conviction, father was ordered to take a three-month first offender course. The course met once a week for an hour, and provided education on abstinence. Father denied that he currently drove while under the influence or that he drank alcohol. Father claimed his last drink was on New Year's Eve.

13

Father denied he ever used physical discipline on the children, but that "[he] might talk a little loud, as any parent would do." Father recently disciplined Daniel when the child stole $1 by taking away Daniel's phone, making him wash the cars, and not allowing him to go outside to play with his friends. When asked about Isaac's statements that father hit him with a belt, father responded, "I can't remember that." Father claimed the first time he argued in front of the children was in 2012. Father knew that when mother had moved out at various times during their relationship, she lived in a shelter.

Father requested the court dismiss the petition. Even if there had been domestic violence, the issue was whether there was current risk, and the facts established that mother and father had not resided together in over a year and had not been communicating. There also had to be current risk stemming from father's alcohol abuse and there was no evidence of such abuse. Mother also requested the petition be dismissed, arguing that dependency serves a dual purpose: (1) to protect children from abuse and neglect, and (2) to provide services to assist families to reunify. However, here there did not appear to be a current risk of domestic violence, noting that the parents have been separated for over a year, and when the domestic violence happened, mother took immediate steps to move herself and the children to a shelter.

The court observed that there was a family law case in progress in another county. The court found father did not recall some incidents, and minimized other instances of domestic violence, and that the children's version of events supported mother's version. The court continued, "I'm not sure these are really [subdivision] (a) counts, though. . . . The children never [had] serious harm inflicted nonaccidentally upon them. And given that [the parents are] separated, I don't think there's a risk that they will suffer serious harm inflicted nonaccidentally on them. So as to all the [subdivision] (a) counts, I'm going to dismiss those because I don't think these are (a)'s."

Further, the court stated that "[f]or a [subdivision] (b) it has to be that the child has suffered or there is a substantial risk they will suffer serious physical harm or illness . . . . [¶] . . . It is kind of disturbing the boys' behavior, Daniel and Isaac's

14

behavior . . . when children are exposed to domestic violence within the home, they can mimic it . . . . So I am very concerned about the children. [¶] I think there is a history of domestic violence, even though it's kind of old. The fact that for a while there was a restraining order in place and now they've completely separated doesn't mean that there isn't danger. Because if a parent is capable of that kind of behavior, they can be capable of it. And they haven't done anything to address it, which I don't think dad has really done, then they are still subject to losing their temper, behaving inappropriately. [¶] And I do believe that dad is still drinking. The children say he's drinking. They use the present tense, not the past tense. And dad's—he doesn't remember. I just don't believe that he isn't drinking even beer. And I think he [believes] beer isn't alcohol."

The court dismissed all of the section 300, subdivision (a) allegations, dismissed count b-3, sustained b-2 and b-4 as pleaded, and sustained amended b-1 to state, "'on 7/18/2012, father engaged in violent altercation, [in] which father struck mother's arms and body with father's fists in the presence of the children,'" and also to state, "'On prior occasions, he threw objects at the mother and she failed to protect'" the children. The court sustained allegation j-1 and dismissed allegation j-2.

With respect to disposition, the court observed that "[its] impression of [mother] was that she was very passive when father was overbearing and that she's a little overwhelmed with the children's behavior now. And there were times when the children said . . . [father had done] something, and [mother] would say, 'well, that's what you get.'" The court stated that the children should be with the parents, but father needed to take anger management and domestic violence classes. Further, father had a DUI for which he was still on probation, and the court was concerned that father not drink and drive, or drink at home because such drinking could cause a loss of control or judgment.

The court declared the children dependents of the court under section 300, subdivisions (b) and (j). The court ordered that the parents would have joint legal custody of the children and that mother have primary physical custody. In addition, the court ordered mother to participate in a domestic violence support group for victims,

15

individual counseling, and family preservation services.  The court ordered father to attend a 52-week domestic violence program, parenting classes, a 12-step program with a sponsor, and to substance test.  The court ordered services for the children to include individual counseling to address the case issues.

## DISCUSSION

Both mother and father, who join in each other's briefs, argue the remaining allegations of the petition should be dismissed and the matter dealt with in the family court proceedings.  They contend the events the dependency court relied on to support jurisdiction are remote in time and do not present a future risk of harm to any of the children because the parents are no longer together and are in the process of divorce, and thus any physical abuse will not continue; mother has demonstrated she is able to obtain services for the children on her own; the family court can provide adequate services to the family; and father is no longer drinking.  DCFS argues that the dependency court erred in dismissing the section 300, subdivision (a) counts and in dismissing the section 300, subdivision (j) counts because there is no basis to conclude the parents' separation is sufficient to protect the children from future acts of harm due to the parents' cyclical pattern of abuse and reconciliation.

I.      **Mother and Father's Appeal**

A.      *The Sustained Allegations Under Section 300, Subdivisions (b) and (j)*

Count b-1, as amended, read "'on 7/18/2012, father engaged in a violent altercation, [in] which father struck mother's arms and body with father's fists in the presence of the children,'" and "'on prior occasions, he threw objects at the mother, and she failed to protect.'"

Count b-2 alleged, "'On prior occasions, the children['s] father . . . physically abused . . . Isaac by striking the child with a belt.  On a prior occasion, the father pushed the child. Such physical abuse was excessive and caused the child unreasonable pain and suffering.  The children's mother . . . failed to protect the child when she knew of the father's physical abuse of the child.  Such physical abuse of the child by the father, and

16

the mother's failure to protect the child, endangers the child's physical health and safety and places the child and the child's siblings . . . at risk of physical harm, damage, danger, physical abuse and failure to protect."

Count b-4 alleged, "The . . . children['s] father . . . has a history of alcohol abuse and is a current abuser of alcohol, which renders the father unable to provide regular care of the children. On prior occasions, the father was under the influence of alcohol while the children were in the father's care and supervision. The father has a history of a criminal conviction of Driving Under the Influence of Alcohol. The mother failed to protect the children when she knew of the father's abuse of alcohol. The mother allowed the father to reside in the children's home and have unlimited access to the children. The father's abuse of alcohol, and the mother's failure to protect the children, endangers the children's physical health and safety and creates a detrimental home environment, placing the children at risk of physical harm, damage and failure to protect."

Count j-1 alleged, "On prior occasions, the children['s] . . . [father] . . . physically abused the child Isaac by striking the child with a belt. On a prior occasion, the father pushed the child. Such physical abuse was excessive and caused the child unreasonable pain and suffering. The children's mother . . . failed to protect the child when she knew of the father's physical abuse of the child. Such physical abuse of the child by the father, and the mother's failure to protect the child, endangers the child's physical health and safety and places the child and the child's siblings . . . at risk of physical harm, damage, danger, physical abuse and failure to protect."

### B.    *Substantial Evidence Supports Jurisdiction*

On review, we determine whether the juvenile court's jurisdictional finding is supported by substantial evidence. (*In re P.A.* (2006) 144 Cal.App.4th 1339, 1344.) In so doing, we "must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.) Under this standard, the juvenile court, not this court, assesses the credibility of witnesses, resolves conflicts in the

17

evidence, and determines where the weight of the evidence lies. (*Id*. at pp. 52–53.) "We affirm the rulings of the juvenile court if there is reasonable, credible evidence of solid value to support them." (*In re Matthew S*. (1996) 41 Cal.App.4th 1311, 1319.) "We cannot reweigh the evidence or substitute our judgment for that of the trial court." (*In re Cole C*. (2009) 174 Cal.App.4th 900, 918.)

"Section 300, subdivision (b) provides a basis for jurisdiction if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness caused by the parent's inability to provide regular care for the child because of the parent's mental illness, developmental disability or substance abuse." (*In re James R*. (2009) 176 Cal.App.4th 129, 135.) A jurisdictional finding under section 300, subdivision (b) requires "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M*. (1991) 1 Cal.App.4th 814, 820.) "Subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness." (*Id*. at p. 823; *In re Alysha S*. (1996) 51 Cal.App.4th 393, 399.) Subdivision (j) provides that the juvenile court has jurisdiction over a child who comes within the following description: "The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

The court may consider pasts events when determining whether the child presently needs dependency court protection, as "[a] parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative'" and the "court 'must consider all the circumstances affecting the child, wherever they occur.'" (*In re T.V*. (2013) 217 Cal.App.4th 126, 133.)

### 1. Counts b-1, b-2, and j-1

Domestic violence supports jurisdiction under subdivision (b). "'"[D]omestic violence in the same household where the children are living . . . is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." [Citation.] Children can be put "in a position of physical danger from [spousal] violence" because, "for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg . . . ." [Citation.]' [Citation.]" (*In R.C.* (2012) 210 Cal.App.4th 930, 941–942.)

In *In re Heather A.* (1996) 52 Cal.App.4th 183, the minor child Heather and her sister Helen were placed with their father and stepmother. (*Id.* at p. 187.) Soon thereafter, the stepmother reported that the father was physically abusing her, and that the children had witnessed several episodes of abuse. (*Id.* at pp. 187–188.) Although the father had not physically abused the children, they had been exposed to his abuse of the stepmother, who suffered from battered woman's syndrome. (*Id.* at p. 190.) The dependency court sustained the petition under section 300, subdivision (b) because although the children were not the ones being physically abused, they could see and hear the violence between the parents. (*Id.* at p. 192.) On appeal, the court rejected the father's argument that jurisdiction under subsection (b) was not met under the *Rocco M.* three-part test, finding instead that "domestic violence in the same household where the children are living *is* neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. Such neglect *causes* the risk." (*Id.* at p. 194.)

In *In re Daisy H.* (2011) 192 Cal.App.4th 713, the father choked and pulled the mother's hair two to seven years before the dependency petition was filed. The children denied ever seeing domestic abuse and there was no evidence the alleged hair-pulling and choking incidents occurred in the children's presence. Further, the children were not afraid of the father. The *Daisy H.* court found the evidence insufficient to support the

19

finding that the prior acts of domestic violence placed the children at a current substantial risk of physical harm, stating: "Physical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b) but only if there is evidence that the violence is ongoing and likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm." (*Id*. at p. 717.)

Here, however, even though the most recent documented instances of domestic violence were a year old at the time of the jurisdictional hearing, we find substantial evidence supports jurisdiction. Mother had a pattern of repeatedly, over the course of over 10 years, of leaving father and reconciling with him; father's violence toward his family escalated over the years, rather than decreased; the children report that father is still drinking, indicating that he has not accepted that he has a problem with alcohol; father minimizes the domestic violence in the home; and Daniel and Isaac demonstrate the damage the violence in the home has done to them by acting out their own pattern of violence. Most important, the children have regular visitation with father, which puts them at risk of harm should father relapse and begin drinking.

### 2. Count b-4

Mother and father argue that the b-4 allegation of father's substance abuse is not supported by substantial evidence because father did not have a diagnosis of substance abuse, his DUI conviction dated from 2012 and there were no prior or subsequent offenses, father claims he no longer drinks, and even the court agreed father did not need to participate in a full program.

In *In re Drake M*. (2012) 211 Cal.App.4th 754 (*Drake M.*), the dependency court found jurisdiction over a child whose father smoked legal marijuana. *Drake M.* considered the issue of whether habitually smoking legal marijuana constituted conduct that rendered a father incapable of providing regular care and supervision to a child, and found that such conduct could fall within the purview of section 300, subdivision (b), if a child has suffered or was at substantial risk for suffering serious physical harm or illness

20

as a result of:  (1) a parent's inability to provide regular care due to substance abuse or (2) the parent's failure to adequately supervise or protect the child.  (*Drake M.*, at p. 763.)

The *Drake M.*, *supra*, 211 Cal.App.4th 754 court held that a finding of substance abuse must be based on "evidence sufficient to (1) show that the parent or guardian at issue had been diagnosed as having a current substance abuse problem by a medical professional or (2) establish that the parent or guardian at issue has a current substance abuse problem as defined in the [American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders]." (*Drake M.*, at p. 766.)  *Drake M.* determined that DCFS had failed to prove the father was a substance abuser in the absence of evidence from a medical professional because there was no evidence that the father suffered from any recurrent substance abuse problems.  (*Id.* at pp. 767–768.)  The father had a legal, medical recommendation to use marijuana for recurring knee pain and could adequately care for the child.  (*Ibid.*)  The child had food, water, and shelter; there was no evidence of abuse in the home; and no evidence showed that the child was not supervised.  (*Id.* at pp. 768–769.)

The indicia of a substance abuse problem include:  "'(1) recurrent substance use resulting in a failure to fulfill major role obligations at work, school or home (e. g., repeated absences or poor work performance related to substance use; substance-related absences, suspensions, or expulsions from school; neglect of children or household)[; [¶]] (2) recurrent substance use in situations in which it is physically hazardous (e. g., driving an automobile or operating a machine when impaired by substance use)[; [¶]] (3) recurrent substance-related legal problems (e.g., arrests for substance-related disorderly conduct)[; and [¶]] (4) continued substance use despite having or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance (e.g., arguments with spouse about consequences of intoxication, physical fights.'" (*Drake M.*, *supra*, 211 Cal.App.4th at p. 766.)

Here, although father was not a diagnosed substance abuser, there was ample evidence that he met the definitional criteria of a substance abuser:  he had neglected his

21

children and his household (by not coming home for periods of time; drinking and abusing his children and mother); he drove an automobile while intoxicated and was convicted of driving under the influence; and his family life was a shambles due to his violent and angry behavior when drunk. Father's protestations that he no longer drinks are contradicted by the children's testimony that he still drinks beer, which indicates that father has not addressed his substance abuse problem at all. Thus, the parents' separation, without more, does not address the underlying problems in the family that led to the dependency proceedings.

### C.  *Dispositional Order*

Father argues that the dependency court ordered him to participate in services not supported by the evidence, including abstinence from alcohol, regular testing, a 12-step program, and a domestic violence program for offenders. He asserts such services will not address the issues that brought the family before the dependency court because he is no longer a regular drinker, and already participated in a first-offender three-month course as a result of his DUI conviction. Mother requests that if we find no jurisdiction, we reverse the dispositional order.

At the dispositional hearing, the dependency court must order child welfare services for the minor and the minor's parents to facilitate reunification of the family. (§ 361.5, subd. (a); Cal. Rules of Court, rule 5.695(h).) "The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion." (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.) The reunification plan must be appropriate for the family and be based on the unique facts relating to that family. (*Ibid.*) "The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the minor is a person described by Section 300." (§ 362, subd. (d); *In re Basilio T.* (1992) 4 Cal.App.4th 155, 172.) DCFS must offer services designed to remedy the problems leading to the dependency proceedings. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1165.)

We will not reverse the dependency court's dispositional orders except for a clear abuse of discretion. (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 64–65.) An abuse occurs when the court exercises its discretion in an "'arbitrary, capricious or patently absurd manner'" resulting in a manifest miscarriage of justice. (*In re Brequia Y.* (1997) 57 Cal.App.4th 1060, 1068.)

Here, we find no error. Father fails to acknowledge his alcohol problem, which was the root of the family's domestic violence problems, and provides no evidence that his problem has been resolved. On the other hand, the children testified that father currently uses alcohol, drinking beer several times a week. The long-standing domestic violence resulting from father's drinking had resulted in severe behavioral problems in Daniel and Isaac, such that mother was unable to handle them. Finally, Viviana and Genesis were afraid of father when he drank and were the targets of Daniel and Isaac's acting out behavior, and Viviana had stated father had touched her inappropriately. These problems cannot be addressed without father getting the services the dependency court ordered.

## II.     DCFS's Cross-appeal

### A.     *The Dismissed Allegations Under Section 300, Subdivisions (b) and (j)*

Count a-1 alleged that, "On 07/18/2012, the children['s] . . . mother . . . and the children's father . . . engaged in a violent altercation in which the father struck the mother's arms and body with the father's fists while the father held the mother's arm behind the mother's back, in the presence of the children. The father stepped on the mother's breast and feet and pushed the mother. On 07/04/2012, the father repeatedly struck the mother's stomach in the presence of the children. The father broke the bedroom door where the mother and the children sought refuge. On prior occasions, the father threw objects at the mother in the presence of the child [Daniel]. The mother failed to protect the children in that she allowed the father to reside in the children's home and have unlimited access to the children. Such violent altercations on the part of the father against the mother, and the mother's failure to protect the children, endangers

23

the child's physical health and safety and places the child at risk of physical harm, damage, danger and failure to protect."

Count a-2 alleged that "On prior occasions, the children['s] . . . father . . . physically abused the child Isaac by striking the child with a belt. On a prior occasion, the father pushed the child. Such physical abuse was excessive and caused the child unreasonable pain and suffering. The children's mother . . . failed to protect the child when she knew of the father's physical abuse of the child. Such physical abuse of the child by the father, and the mother's failure to protect the child, endangers the child's physical health and safety and places the child and the child's siblings . . . at risk of physical harm, damage, danger, physical abuse and failure to protect."

Count a-3 alleged, "On prior occasions, the children['s] . . . mother . . . physically abused the children by slapping and pinching the children. Such physical abuse was excessive and caused the children unreasonable pain and suffering. The children's father . . . failed to protect the children when he knew, or reasonably should have known, of the mother's physical abuse of the children. Such physical abuse of the children by the mother, and the father's failure to protect the children, endangers the children's physical health and safety and places the children at risk of physical harm, damage, danger, physical abuse and failure to protect."

Count j-2 alleged, "On prior occasions, the children's . . . mother . . . physically abused the children by slapping and pinching the children. Such physical abuse was excessive and caused the children unreasonable pain and suffering. The children's father . . . failed to protect the children when he knew, or reasonable should have known, of the mother's physical abuse of the children. Such physical abuse of the children by the mother, and the father's failure to protect the children, endangers the children's physical health and safety and places the children at risk of physical harm, damage, danger, physical abuse and failure to protect."

### B.    Discussion

A child is described by section 300, subdivision (a), if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent . . . ."  Jurisdiction is appropriate where, through exposure to a parent's domestic violence, a child suffers or is at substantial risk of suffering serious physical harm inflicted nonaccidentally by the parent.  The purpose of subdivision (a) "'is to provide maximum safety and protection for children who are currently being physically . . . abused.'"  Although the court may also assume jurisdiction of a child based on exposure to domestic violence under subdivision (b), subdivision (a) may also apply.  (*In re Giovanni F*. (2010) 184 Cal.App.4th 594, 599.)

Striking a child with an open hand or fist, causing bruises, constitutes serious physical harm within the meaning of section 300, subdivision (a).  (See *In re Veronica G*. (2007) 157 Cal.App.4th 179, 185–186; see also *In re Joseph B*. (1996) 42 Cal.App.4th 890, 894 [finding jurisdiction under § 300, subd. (a) where the mother had hit the child with a belt, leaving bruises on his arm, back and buttocks].)  Even evidence of a single incident of physical harm to a child is sufficient for the juvenile court to assume jurisdiction under section 300, subdivision (a).  In *In re Mariah T*. (2008) 159 Cal.App.4th 428, 438, the appellate court affirmed a jurisdictional finding under section 300, subdivision (a) on the basis of evidence that the mother used a belt on a three-year-old child as punishment, once striking him on the stomach and forearms leaving purple bruises.

Here, the evidence was in conflict whether the children actually suffered serious harm within the meaning of section 300, subdivision (a).  The parties disputed whether father's hitting of the children left bruises such that they sustained serious physical harm.  The children denied that there were bruises, but mother stated there was a bruise on one of the children after being hit.  Thus, although the domestic violence in the home was

25

sufficient to bring mother and father within subdivision (b) jurisdiction, we agree with the court's determination that it does not rise to the level of subdivision (a) jurisdiction.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.